O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| DAVE DELGIACCO, | Case No.: SACV 14-0200 DOC(DFMx) |
| Plaintiff, | ORDER |
| vs. | **GRANTING DEFENDANT COX COMMUNICATIONS, INC.'S MOTION FOR SUMMARY JUDGMENT [48]** |
| COX COMMUNICATIONS, INC.; COX ENTERPRISES, INC.; COX COMMUNICATIONS CALIFORNIA, LLC; and COXCOM, LLC, | **GRANTING IN PART AND DENYING IN PART DEFENDANTS COX COMMUNICATIONS CALIFORNIA, LLC'S AND COXCOM, LLC'S MOTIONS FOR SUMMARY JUDGMENT [49]** |
| Defendants. | **DENYING AS MOOT DEFENDANT COX ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT [50]** |
| | **DENYING PLAINTIFF'S MOTION FOR SANCTIONS [52]** |
| | **SETTING MANDATORY SETTLEMENT CONFERENCE WITH MAGISTRATE JUDGE MCCORMICK ON MONDAY, APRIL 13, 2015, AT 11:00 A.M.** |
| | **SETTING BRIEFING SCHEDULE FOR MOTIONS IN LIMINE [74] [75] [76] [77] [78] [79] [80] [81] [82] [83] [84] [85] [86] [87] [88] [90] [91] [92]** |
| | **REQUIRING LODGING OF AMENDED FINAL PRETRIAL ORDER [93]** |

Before the Court are Defendant Cox Communications, Inc.'s Motion for Summary Judgment ("CCI Mot.") (Dkt. 48), Defendants Cox Communications California, LLC's and CoxCom, LLC's Motion for Summary Judgment ("CCC Mot.") (Dkt. 49), Defendant Cox Enterprises, Inc.'s Motion for Summary Judgment ("CEI Mot.") (Dkt. 50), and Plaintiff's Motion for Sanctions ("Sanctions Mot.") (Dkt. 52).

## I.  Background

This case arises from Plaintiff Dave DelGiacco's claim that his employer suspended him for taking Family Medical Leave Act (FMLA) leave and that his employer failed to reasonably accommodate his need to check his blood sugar levels to manage his type II diabetes. *See generally* Compl. (Dkt. 1).

### A.  Facts

#### 1.  Plaintiff's Job

Plaintiff worked as a retention representative for "Cox," a cable television and internet services provider, in Orange County, California from approximately May 2008 to December 2011. The parties dispute which Cox entities actually employed Plaintiff. This issue is discussed in greater detail *infra*. His job was to answer phone calls from customers who wanted to cancel service, to resolve customer concerns and issues, and to upsell services. CCC-PAF Nos. 1-2.[1]

His direct supervisor from 2009 to October 2011 was Erica Wilson. Wilson's replacement Mariza Garcia was Plaintiff's direct supervisor from November 2011 until his suspension on December 7. Erica Wilson Dep. 162:1-163:16. Wilson, and later Garcia, oversaw Plaintiff's work on a day-to-day basis. They, in conjunction with their boss, retention department manager Jessica Allsopp, made decisions on scheduling the work day of Plaintiff and approximately twelve other retention representatives. CCC-SUF Nos. 13, 28, 95. In 2011,

---

[1] The Court will refer to Plaintiff's Additional Facts submitted in connection with Defendants Cox Communications California, LLC, and CoxCom, LLC's Motion as "CCC-PAF" (Dkt. 53-1) and Defendants' undisputed facts as "CCC-SUF" (Dkt. 49-2). Similarly, the Court will refer to Plaintiff's Additional Facts submitted in connection with Defendants Cox Communications, Inc.'s Motion as "CCI-PAF" (Dkt. 54-1) and Defendants' undisputed facts as "CCI-SUF" (Dkt. 48-2).

the human resources employee who consulted with Plaintiff's department was Chona Boretti. CCC-SUF No. 21.

Plaintiff had two fifteen-minute rest breaks and a half-hour lunch break provided every day. In addition to regular breaks, all agents were permitted to use a "personal" code in their phone system to temporarily stop calls for personal needs, such as going to the bathroom. CCC-SUF Nos. 49-50. The expectation of Plaintiff's position was that he would be available to answer phone calls 88% of the day, excluding meal and rest breaks. Plaintiff can recall only one month, in 2010 or 2011, when Erica Wilson raised any issues with his occupancy level on the phones. CCC-SUF Nos. 54-55. Plaintiff sometimes smoked during his rest breaks. He sometimes sent personal emails and joked and bantered with his friends at Cox in person or over chat messages during the workday. CCC-SUF Nos. 58-59.

### 2.  Plaintiff's Health Issues and Alleged Requests for Accommodations

Plaintiff was first diagnosed with type II diabetes in January 2010. CCC-SUF No. 36. At the time of his diagnosis, he was educated on the course of care he should follow for diabetes, including the need to "test your blood before you eat, test your blood after you eat, test your blood if you're not feeling well." CCC-SUF No. 37. The blood test would take 30 seconds to a couple of minutes. After his diagnosis in January 2010, Plaintiff needed to test his blood from one to ten times a day. He usually tested his blood from one to four times per day during work hours. He usually tested his blood at his desk or sometimes in his car, both during and outside of rest break and meal break times. CCC-SUF Nos. 38-44, 46. Sometimes Plaintiff took intermittent FMLA leave during a workday, ranging in duration from a few minutes to a few hours, to test his blood sugar levels. On the days when he took FMLA leave, he may have tested his blood sugar other times during that same day, without needing to take FMLA leave for that other testing. CCC-SUF No. 47.

From August 2010 to January 2011, Plaintiff took FMLA leave first to care for his wife while she was dying from cancer, and after her death, to take care of his own post-traumatic stress disorder ("PTSD"), anxiety disorder, and major depressive disorder. CCC-PAF Nos. 23-25. Prior to returning from caring for his wife and himself, he was asked to identify any medical

restrictions that he may have, and his doctor stated that he was prepared to "resume his duties from a medical perspective as of 1/3/11." CCC-SUF No. 61. When Plaintiff returned from leave in January 2011, he says everyone was "Very professional, very congenial, very welcoming." CCC-SUF No. 135.

### a.  Request for "Medical" Code

After returning to work, Plaintiff claims to have asked his supervisor Erica Wilson about a code that he could use to log off the phone system, without any adverse consequences, such that he could take additional short breaks during his shift to check his blood sugar levels and manage his diabetes. CCC-PAF No. 12. Plaintiff claims that he was told there was no code and that there was no other alternative accommodation available, even though Cox in fact did have a "medical" code for its employees. CCC-PAF Nos. 14-15.

### b.  Request to Stand Up and Walk Around

Plaintiff also claims that he vocalized a need for accommodation to Erica Wilson. Plaintiff testified at his deposition that he recalls

> going in and talking to Erica that I'm a diabetic, and I need accommodations. And one of the accommodations that I need was for my neuropathy. You know, Erica was a fantastic supervisor over there at Cox, you know, directing me towards Chona. As you can see. I spoke to Erica about my medical condition, and then she directed me to Chona. . . . Chona was in human resources department.

CCC-SUF Nos. 63-64.

On July 7, 2011 at 5:27 p.m., Plaintiff sent an email to Chona Boretti in HR stating that he spoke to his supervisor about his medical condition and its "nothing that seems to be serious, although she mentioned I should speak to you to document. My medical condition requires that I walk around at times to increase circulation in my legs to slow the progression of the disease," and inquired if he could get a code to log off the phones so he could get up and move around. CCC-SUF No. 66. Boretti responded in writing the next morning stating "it appears from your information below that you are not seeking a medical leave of absence but requesting temporary restrictions to be made at work due to a medical condition you have," and that she needed a doctor's note "indicating the specific restriction and how long a period these restrictions would

be for." She gave examples such as "no bending, kneeling, walking on right leg for two weeks beginning 6.8.11" for specificity to be included in the note. Her letter concluded, "due to HIPPA regulations, please do not disclose the specific medical condition you have." CCC-SUF No. 67. Neither Plaintiff nor Boretti recall Plaintiff providing her a medical note. Plaintiff claims he provided medical documentation to Cox's FMLA administrator. DelGiacco Decl. ¶ 24 (Dkt. 53-3).

In 2011, Cox contracted with an ergonomics consultant, Mike Gee, who runs a company called Pro-Fit Ergonomic Solutions, and he engaged in workplace assessments, including recommending changes to work stations to avoid injury. In 2011, Gee visited company offices every week or two and met with employees who had been identified as needing his assistance with ergonomic related issues. Plaintiff believes that either his supervisor or Boretti sent Gee an email, instructing Gee to contact Plaintiff. Plaintiff states that Gee "came over, he accommodated, he put a thing on my desk that I could lift it up so I could stand up." Gee also provided Plaintiff some exercises he could do. Plaintiff had a wireless headset in 2011. For a time, Plaintiff could walk around the office while on the phone without limitation, but later he was told he had to stay closer to his own desk. CCC-SUF Nos. 77-83.

### c. Request for Private Space

Plaintiff also claims to have vocalized a need for accommodation to Mariza Garcia. Garcia became Plaintiff's supervisor in November 2011, after transferring from another department. CCC-SUF Nos. 84-85. Plaintiff claims there was a nurse who worked for Aetna who suggested to him that he test in "a private area where he can be calm." He never asked for or was provided a note from this nurse discussing this suggestion to test in a private area. On November 16, 2011, Plaintiff sent an email to Garcia stating, "Mariza . . . did you find out about a place to test my glucose [sic] levels? No big . . . . just checking. . . ." CCC-SUF Nos. 86-88. Garcia summarized Plaintiff's concerns in an email to Chona Boretti in HR in November 2011, and Boretti responded to her with specific questions. CCC-SUF No. 89. Plaintiff claims he never heard back from Garcia or anyone else at Cox. DelGiacco Decl. ¶ 9. Garcia recalls telling him he could use an empty office or a locking bathroom close to him. Garcia Decl. ¶ 10 (Dkt. 49-3).

### 3. Plaintiff's Suspension

On December 7, 2011, Plaintiff was suspended from his job after a meeting with his supervisor Garcia, her supervisor Jessica Allsopp, and HR representative Chona Boretti. Defendants maintain that Plaintiff was suspended because he mishandled some customer calls by intentionally hanging up on them or transferring them to other departments. Defendants claim that Garcia and Allsopp discovered these allegedly mishandled calls on December 6, 2011 when Allsopp used tapes of calls handled by Plaintiff and others to train Garcia on using Qfiniti software to monitor agents' calls. *See* CCC-SUF Nos. 101-114. The problematic calls included calls where Plaintiff disconnected before the customer did, where Plaintiff allegedly transferred a customer who wished to disconnect to the sales department, where Plaintiff allegedly transferred to tech a customer who wished to cancel voicemail, and where Plaintiff allegedly improperly told a customer who wished to cancel in two weeks that it was too soon and they should go to a retail store. *See* CCC-SUF Nos. 112-113. That day, Allsopp called and emailed her boss, Pablo Pareja, about the issues she identified with Plaintiff's calls. CCC-SUF No. 140. The next day, on December 7, she sent an email to the IT department seeking records that would show which calls where Plaintiff hung up before the customer. CCC-SUF No. 112.

Plaintiff does not dispute that handling calls in the manner described would be against the company's policy. CCC-SUF Nos. 116-118, 124, 129. However, he vigorously disputes that he actually mishandled any calls. He asked at the December 7 meeting to listen to the calls, but Allsopp refused to allow him to listen to the calls. CCC-PAF Nos. 79-80, 83. The tapes of the calls have since disappeared. The only records left are Allsopp's notes and a spreadsheet sent by the IT department.

Plaintiff was told on December 7 that it would be about a week until the investigation was completed. CCC-SUF No. 141. On December 12, Plaintiff certified that he was disabled and unable to work due to a medical condition as of December 6, 2011. CCC-SUF No. 131. He has not returned since. Cox made the decision to fire him a few days after he went on medical leave. However, they never formally notified Plaintiff of their decision. CCC-PAF No. 4.

## B.  Procedural History

Plaintiff has filed three complaints with California's Department of Fair Employment and Housing (DFEH) alleging that Cox discriminated against him on the basis of disability. The first was on September 14, 2012. CCC-SUF No. 3. The second and third were after this lawsuit began, on January 8, 2014 and March 9, 2015. CCC-SUF No. 1; Mazda Decl. Ex. L (Dkt. 53-2).

Plaintiff brought suit in Orange County Superior Court on July 23, 2013, alleging two causes of action: (1) discrimination and retaliation for taking FMLA leave; and (2) disability discrimination in violation of the California Fair Employment and Housing Act (FEHA), specifically, failure to reasonably accommodate Plaintiff's disability and failure to engage in an interactive process with Plaintiff. *See generally* Compl.

The lawsuit was removed to federal court on February 11, 2014. Notice of Removal (Dkt. 1). The instant Motions for Summary Judgment and Motion for Sanctions were filed on March 2 and 5, 2015, respectively (Dkts. 48, 49, 50, 52). After briefing was completed, oral argument was held on April 2 (Dkt. 94).

## II. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III. Discussion

### A. Cox Enterprises, Inc. Motion for Summary Judgment

On March 11, 2015, the parties stipulated for Plaintiff to dismiss all claims against Cox Enterprises, Inc. (Dkt. 57). Accordingly, Cox Enterprises, Inc.'s Motion for Summary Judgment is DENIED AS MOOT.

### B. Whether Cox Communications, Inc. is Plaintiff's Employer for FMLA and FEHA Purposes

Defendant Cox Communications, Inc. ("CCI") argues that Plaintiff's claims against CCI should be dismissed because CCI is not Plaintiff's employer within the meaning of the FMLA or FEHA, unlike its subsidiaries Defendants CoxCom, LLC ("CoxCom") and Cox Communications California, LLC ("CCC").[2]

---

[2] Since Defendants do not argue that any of them lack the financial resources to pay Plaintiff should he prevail on his claims, ordinarily the Court would not expect to see a dispute over which entity is Plaintiff's true employer. However, because the parties dispute whether Plaintiff properly exhausted his administrative remedies against CoxCom and CCC, *see infra*, determining whether CCI is Plaintiff's employer has taken on heightened importance.

The FMLA defines an employer as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year," including "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer" and "any successor in interest of an employer." 29 U.S.C. § 2611(4). FEHA defines an "employer" as "any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly . . . ." Cal. Gov't Code § 12926(d). A parent corporation can be treated as a single employer with its subsidiaries under "integrated enterprise" or "joint employer" tests developed by the courts. Based on these statutory definitions, a parent corporation can also be held liable if it acted as its subsidiary's agent.

The Court will address each test in turn.

### 1. Integrated Enterprise Test

The integrated enterprise test is often used by federal courts and has been adopted for FEHA claims. The test has four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 737 (1998). To demonstrate a triable issue of fact on the "interrelations of operations" prong at summary judgment,

> the plaintiff must do more than merely show that officers of the subsidiary report to the parent corporation or that the parent benefits from the subsidiary's work. Since these facts exist in every parent-subsidiary situation, such a showing would create a triable issue of material fact in every case. What the plaintiff must show, rather, is that the parent has exercised control "to a degree that exceeds the control normally exercised by a parent corporation."

*Id.* at 738 (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993)). To satisfy the centralized control of labor relations prong, often considered the most important, the parent must control the subsidiary's day-to-day employment decisions, not just make broad general policy statements about employment matters. *Id.* Defendants concede that the fourth factor is met.

However, common ownership or control alone is never enough to establish parent liability. *Id*. at 738. Therefore, the Court must consider whether the first three factors have been met.

The relevant facts are as follows:

Plaintiff's 2011 W-2 identified "CoxCom, Inc." as his employer. CCC-SUF No. 12. CoxCom is a wholly-owned subsidiary of CCI. CCI-PAF No. 235. CoxCom was organized as a corporation until mid-2011, when it was reformed into CoxCom, LLC. In 2011, CoxCom owned and operated the cable system in Orange County where Plaintiff worked. CCC-SUF Nos. 8-9. In January 2012, CCC was formed as a wholly-owned subsidiary of CoxCom to hold and operate all CoxCom's California cable television assets, which consist of cable systems in San Diego, Orange County, Palos Verde, and Santa Barbara. CCC-SUF No. 10.

In December 2011, CCI had 89 officers and CoxCom had 56 officers. Of these, 14 persons were simultaneously officers of both CCI and CoxCom. CCI and CoxCom also had one director in common at that time. CCI-SUF Nos. 10, 35. This factor weighs against finding CCI to be an integrated enterprise with its subsidiaries.

CCI provides a number of services for CoxCom and CCC employees in California. Some are services that support local personnel. For instance, CCI has a human resources department that provides support for its subsidiaries' human resources personnel. Sangston Dep. 34:17-35:11. CCI develops training materials and provides training in areas where CCI believes it is important to have consistent messaging across its subsidiaries, such as ethics. Local subsidiaries also develop and conduct much of their own training in areas such as product and service offerings, installation, and programming. *Id.* at 10:12-14:4, 27:14-29:8, 45:15-46:25. Similarly, the local subsidiaries have their own public affairs and government relations personnel, but CCI provides support in those areas. *Id.* at 35:25-36:12. CCI also provides support with email and records retention, IT, tax, accounting, payroll administration, marketing and sales, technology and engineering. *Id.* at 36:18-38:21.

Some functions are maintained only at CCI. For instance, CCI interfaces with UNUM, a third-party vendor that administers an FMLA leave program for all Cox employees throughout the country. *Id.* at 36:13-17. CCI's legal department functions as the legal department for all of

its subsidiaries. CCI employs Joe Freeman, a senior employment attorney who provides legal advice to human resources personnel regarding CCI and CCI subsidiaries' employees. *Id.* at 10:12-14:4, 37:2-5. CCI's legal department issues litigation holds and conducts electronic discovery, including in this case. *Id.* at 60:21-61:15.

In 2014, as part of a broad decision to take certain functions out of the local market and "into a center of excellence model," CCI made the decision to close the Rancho Santa Margarita call center, where Plaintiff worked, and to lay off employees who had worked there. *Id.* at 43:19-44:16.

These facts do not satisfy the integrated enterprise test. The most important factor is whether CCI and CoxCom had centralized control over employment decisions. The fact that local supervisors and HR personnel could consult with CCI's HR department or legal department on HR issues and the fact that CCI decided to close the Rancho Santa Margarita call center, which by necessity meant laying off or transferring employees, do not demonstrate that CCI was involved in the day-to-day employment decisions of CoxCom or CCC. Nor does the fact that CCI, through UNUM, handled FMLA administration for its subsidiaries. *Cf. Laird*, 68 Cal. App. 4th at 739 (holding that the fact that the parent corporation maintained pension plans and other benefits for its subsidiary's employees was insufficient to create a triable issue of fact regarding interrelation of operations). The fact that local subsidiaries maintain their own HR, public affairs, government relations, and other staff and develop their own training and the fact that CCI and CoxCom's have a few officers and directors in common, also goes against a finding that CCI and its subsidiaries had interrelated operations generally, as they do not show that CCI had a stronger degree of control than a parent normally has over a subsidiary. Thus, the Court concludes that Plaintiff cannot hold CCI liable under an integrated enterprise theory.

## 2. Joint Employer Test

Courts have used a variety of multi-factor tests to determine whether a defendant is a joint employer.[3] What the tests all have in common is their focus on the extent to which the

---

[3] Courts applying the joint employment test for a FEHA claim have considered factors such as:

defendant has day-to-day control over the plaintiff's work and over employment decisions over plaintiff, including hiring, firing, and rate of pay. *Vernon v. State*, 116 Cal. App. 4th 114, 124-25, 128 (2004); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). The inquiry tends to be intensely fact-dependent and the ultimate determination is based on the totality of the circumstances; there is no magical formula. *Vernon*, 116 Cal. App. 4th at 125; *Bonnette*, 704 F.2d at 1470.

As the facts above demonstrate, CCI did not have day-to-day control over Plaintiff's employment. "Cox Communications" was listed on Plaintiff's earning statements. However, CoxCom was the employer listed on Plaintiff's 2011 W-2, which makes CoxCom the presumptive employer for FEHA purposes. Cal. Gov't Code § 12928. Plaintiff was also paid from CoxCom's budget. Terri Wilson Decl. ¶ 10 (Dkt. 48-3). In addition, it may be true that CCI made the decision to close the Rancho Santa Margarita call center in 2014; that CCI contracted with UNUM to administer FMLA leave; and that Joe Freeman in CCI's legal department was consulted when Plaintiff was suspended. It may also be true that "Cox Communications" provided Plaintiff's employee guidebook. DelGiacco Decl., Ex. D. These facts, however, are insufficient to show that CCI had the kind of "comprehensive and immediate level of 'day-to-day' authority over employment decisions" necessary to find that CCI was

---

payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment.

*Vernon v. State*, 116 Cal. App. 4th 114, 125 (2004). Courts applying the joint employment test in FLSA claims (also applied in FMLA claims) tend to look in particular at four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

Plaintiff's joint employer. *Vernon*, 116 Cal. App. 4th at 128. Plaintiff has not shown, for instance, that CCI was responsible for supervising Plaintiff's everyday work, or for making specific decisions regarding his accommodations, suspension, or termination. Accordingly, the Court concludes that Plaintiff cannot hold CCI liable under a joint employer theory.

### 3.   Agency Theory

"[T]o establish a parent corporation's liability for acts or omissions of its subsidiary on an agency theory, a plaintiff must show more than mere representation of the parent by the subsidiary in dealings with third persons. The showing required is that a parent corporation *so controls the subsidiary* as to cause the subsidiary to become *merely* the agent or instrumentality of the parent[.]" *Laird*, 68 Cal. App. 4th at 741 (internal quotation marks omitted) (second alteration in original). Based on the record described above, there is insufficient evidence to show that CoxCom was merely an agent of CCI as opposed to a separate corporate entity with its own employees, budget, and operations. The Court thus concludes that Plaintiff cannot hold CCI liable under an agency theory.

### 4.   Conclusion

In summary, Plaintiff does not have sufficient evidence to show that CCI was his employer for FEHA or FMLA purposes. Accordingly, the Court GRANTS CCI's Motion for Summary Judgment.

### C.   FMLA Claim

Defendants argue that Plaintiff's FMLA claim should fail as a matter of law because Plaintiff cannot prove that his taking FMLA leave was a negative factor in the decision to suspend him.

The FMLA entitles "employees to take reasonable leave for medical reasons, or the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b). The Act permits an employee to take up to twelve weeks of leave during a twelve-month period. *Id.* § 2612. The Act makes it "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA. 29 U.S.C. § 2615(a)(1). "Interference" includes the "us[ing] the taking of

1   FMLA leave as a negative factor in employment actions, such as hiring, promotions or

2   disciplinary actions." 29 C.F.R. § 825.220(c).

3          The Ninth Circuit has held that the familiar *McDonnell-Douglas* burden-shifting

4   framework often used in discrimination cases does not apply to FMLA interference cases. Thus,

5   a plaintiff does not need to prove that the employer's stated non-discriminatory reason for taking

6   action against him or her was pretextual. Instead, a plaintiff "need only prove by a

7   preponderance of the evidence that her taking of FMLA-protected leave constituted *a* negative

8   factor in the decision to terminate her. She can prove this claim, as one might any ordinary

9   statutory claim, by using either direct or circumstantial evidence, or both." *Bachelder v. Am. W.*

10  *Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001) (emphasis added). Here, to survive summary

11  judgment, Plaintiff must show that there is a "triable issue of material fact on whether [his

12  employer] considered [his] FMLA qualified leave as a factor in [his suspension], thus causing

13  interference with [his] rights under FMLA." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th

14  Cir. 2003).

15         Defendants argue that mishandling calls was a legitimate business reason for suspending

16  Plaintiff and that Plaintiff does not have sufficient evidence to prove that Cox's reason was

17  pretextual. However, as the Ninth Circuit has explained, "there is no room for a *McDonnell*

18  *Douglas* type of pretext analysis when evaluating an 'interference' claim under [the FMLA]."

19  *Bachelder*, 259 F.3d at 1131. "[T]he regulations clearly prohibit the use of FMLA-protected

20  leave as a negative factor *at all.*" *Id.* Thus, "[t]he question . . . is not whether [Cox] had

21  additional reasons for the discharge, but whether [Plaintiff's] taking of . . . FMLA-protected

22  leave was used as a negative factor in [his] discharge." *Id.*

23         Here, there is a triable issue of material fact as to whether Plaintiff's intermittent FMLA

24  leave in November 2011 was a negative factor in Plaintiff's employer's decision to suspend him.

25  His intermittent leave took place close in time to his suspension, which "provides supporting

26  evidence of a connection between the two events." *Xin Liu*, 347 F.3d at 1137; *see also Levine v.*

27  *TERROS, Inc.*, No. CV08-1458-PHX-MHM, 2010 WL 864498, at *8 (D. Ariz. Mar. 9, 2010)

28  (denying summary judgment based on temporal proximity). Plaintiff's employer was aware that

Plaintiff had taken FMLA leave within the last year to care for his wife and that there had been "numerous issues" regarding the tracking of his leave, "[t]o the point when it almost became a legal situation." Terri Wilson Dep. Ex. 41 (Dkt. 53-2) (July 6, 2011 email from Chona Boretti to another employee describing Plaintiff's "history"). There is evidence that Plaintiff performed well at his job for the previous two years based on his supervisor Erica Wilson's deposition testimony. He received a positive review from Wilson on October 24, 2011, only a few weeks before he was suspended for allegedly mishandling calls. Erica Wilson Dep. 162:2-166:15; Terri Wilson Dep. 505:13-20, 510:6-24, 520:14-521:12, Ex. 96. Also, while Defendants claim that Plaintiff mishandled calls, Plaintiff states in his declaration that he "never intentionally hung up on a customer while [he] worked at Cox." DelGiacco Decl. ¶ 31. The evidence supporting Defendants' story that Plaintiff was suspended because of mishandling calls may make it less likely that a jury will find that Plaintiff's intermittent FMLA leave was a factor in Defendants' decision. However, reading Plaintiff's evidence in the light most favorable to him, he has produced sufficient evidence for a rational jury to find that his FMLA leave was a negative factor.

Accordingly, the Court DENIES summary judgment on Plaintiff's FMLA claims.

### D.  FMLA Punitive and Emotional Distress Damages

Defendants argue that Plaintiff is not entitled to punitive and emotional distress damages for his FMLA claim because the FMLA does not allow for such damages. The Court agrees. *See Farrell v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 530 F.3d 1023, 1025 (9th Cir. 2008). Accordingly, the Court DISMISSES Plaintiff's request for punitive and emotional distress damages for his FMLA claim.

### E.  Administrative Exhaustion of Plaintiff's FEHA Claims

California Government Code § 12960 "provides that an employee bringing an FEHA claim must exhaust the administrative remedy by filing an administrative complaint with the DFEH . . . ." *Acuna v. San Diego Gas & Elec. Co.*, 217 Cal. App. 4th 1402, 1412 (2013). A plaintiff cannot sue in court until the DFEH issues a right-to-sue notice. *See* Cal. Gov't Code §

12965(b) (providing that the right-to-sue notice "shall indicate that the person claiming to be aggrieved may bring a civil action").

Defendants raise a number of arguments why Plaintiff's FEHA claims should be barred for failure to exhaust his administrative remedies. These arguments fall into three major categories: (1) Plaintiff's 2012 DFEH complaint did not describe the facts with sufficient particularity; (2) Plaintiff's 2012 DFEH complaint did not name the correct employers; and (3) Plaintiff's DFEH complaints were filed too late. The Court addresses each argument in turn.

## 1. Factual Particularity of 2012 DFEH Complaint

Defendants argue that Plaintiff's September 14, 2012 DFEH complaint did not describe the facts or the nature of the FEHA violation with sufficient particularity. In his 2012 DFEH complaint, Plaintiff stated that, on or before December 6, 2011, "Cox Enterprises, Inc. and Cox Communications, Inc. [collectively "Cox"] discriminated against me because of my disability and my age. Cox also failed to accommodate my disability. Cox also interfered with my rights to take FMLA and CFRA leave, and then retaliated against me for taking an FMLA leave." CCC-SUF No. 4.

It is true that California Government Code § 12960(b) requires the administrative complaint to "set forth the particulars" of the alleged unlawful practice. If the 2012 DFEH complaint was a court pleading being evaluated under the *Iqbal/Twombly* standard, Defendants may have a good argument that the complaint is overly vague and conclusory, such that Plaintiff should not be allowed to proceed. However, Defendants have not provided any binding legal authority for the proposition that a court can or should deny a plaintiff access to the courts based on a factually vague DFEH complaint where the DFEH has already issued a right-to-sue letter. This is not a case in which plaintiff is suing on a different theory than he alleged in his DFEH complaint. *See Hobson v. Raychem Corp.*, 73 Cal. App. 4th 614, 631 (1999), *disapproved of on other grounds by Colmenares v. Braemar Country Club, Inc.*, 29 Cal. 4th 1019 (2003) (dismissing disability discrimination claim based on depression, stress, and alcoholism where the plaintiff's DFEH complaint mentioned only colitis). Rather, Defendants' objection is limited to the lack of particularity in the DFEH complaint allegations.

It may be true that a vague DFEH complaint impedes the employer's and the DFEH's ability to investigate and thus goes against FEHA's purpose of encouraging alternate resolutions before a dispute is brought to court. *See Rojo v. Kliger*, 52 Cal. 3d 65, 83 (1990) ("[T]he exhaustion requirement serves the important policy interests embodied in the act of resolving disputes and eliminating unlawful employment practices by conciliation . . . as well as the salutory goals of easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving the dispute."). It was on this basis that the court in *Foster v. Bank of Am., Nat. Ass'n*, No. 1:13-CV-1188-LJO-BAM, 2014 WL 4092311 (E.D. Cal. Aug. 14, 2014), a case cited by Defendants, held that a plaintiff who had alleged no specific facts about her employer's conduct against her could not bring certain FEHA claims against her employer because she had failed to exhaust her administrative remedies.

This Court, however, believes that policy concerns about enforcing California Government Code § 12960(b) are better addressed to DFEH or the state legislature. In recent years, DFEH has adopted a policy of issuing right-to-sue letters as a matter of course without reviewing administrative complaints in much detail. *See* Cal. Code Regs. tit. 2, § 10005 (allowing complainants to waive investigation by DFEH in favor of obtaining an immediate right-to-sue notice). Thus, in many cases, there is no real administrative investigatory or conciliatory process anymore. If the DFEH's practice is not to investigate, it does not make sense for the Court to bar litigants from court for failing to give DFEH enough detail to investigate. As long as the complaint initiating the lawsuit is sufficiently detailed, the employer is still able to investigate and nothing prevents the parties from reaching an out-of-court settlement even during the course of litigation. Thus, so long as a plaintiff's DFEH complaint identifies the discrimination alleged in the lawsuit, he has filed his DFEH complaint within the statute of limitations, and he has obtained a right-to-sue notice, the Court is not concerned with the level of factual specificity in the DFEH complaint in evaluating whether the plaintiff has exhausted his administrative remedies.

Accordingly, the Court will not dismiss Plaintiff's FEHA claims based on the vagueness of his DFEH complaint.

### 2.  Employers Named in 2012 DFEH Complaint

Defendants argue that Plaintiff's FEHA claims against CCC and CoxCom should be barred because Plaintiff's September 14, 2012 DFEH complaint did not name them as respondents and the 2014 and 2015 DFEH complaints, which did name them as respondents, were untimely. The Court disagrees.

With regard to the first argument, a FEHA plaintiff must exhaust his administrative remedies against each party against whom he wishes to bring suit. Each defendant of the lawsuit must be identified in the caption or body of the plaintiff's administrative complaint. *Cole v. Antelope Valley Union High Sch. Dist.*, 47 Cal. App. 4th 1505, 1509-10 (1996). Here, the 2012 DFEH complaint named "Cox Communications, Inc." and "Cox Enterprises, Inc." as respondents. The body of the complaint refers to these two entities as "collectively 'Cox.'" Defendants fault Plaintiff for failing to list CoxCom as a respondent, given that Plaintiff's 2011 W-2 identified "CoxCom, Inc." as his employer. CCC-SUF No. 12. Under California Government Code § 12928, "there is a rebuttable presumption that 'employer' . . . includes any person or entity identified on the employee's [W-2]." However, given that CoxCom, Inc. was re-organized into CoxCom, LLC just a year before the 2012 DFEH complaint was filed and given that all of Plaintiff's employment-related paperwork except his W-2 referenced "Cox Communications" and "Cox Enterprises" rather than "CoxCom," it was understandable that Plaintiff mistakenly listed "Cox Communications, Inc." as opposed to "CoxCom, Inc." In any event, the body of the complaint refers to "Cox" as a collective entity and Plaintiff promptly filed a second DFEH complaint against CCI, CEI, CoxCom, CCC and "any other entity named 'Cox' that employed Dave DelGiacco" in January 2014, once defense counsel notified him that CoxCom and CCC were DelGiacco's employers. Mazda Decl. ¶ 11, Ex. K. In addition, Defendants admit that CCI's legal department serves all of CCI's subsidiaries, including CoxCom, Sangston Dep. 37:2-5, and the record shows that the legal department received notice of the 2012 DFEH complaint. Mazda Decl., Exs. N-P (Dkt. 54-2). Thus, Defendants cannot be

heard to complain that they did not receive adequate notice of Plaintiff's claims, regardless of which Cox entity technically employed him.

Given the circumstances, the Court accepts the reference to "Cox" and "Cox Communications" in the 2012 DFEH complaint as sufficiently broad to include CoxCom and CCC. In light of FEHA's remedial purpose, punishing Plaintiff with a narrow reading of "Cox" and "Cox Communications" would lead to an inequitable result, especially given the fact that all of the Cox entities received actual notice of his 2012 DFEH complaint. *See Elkins v. Derby*, 12 Cal. 3d 410, 414 (1974) ("[R]egardless of whether the exhaustion of one remedy is a prerequisite to the pursuit of another, if the defendant is not prejudiced thereby, the running of the limitations period is tolled (w)hen an injured person has several legal remedies and, reasonably and in good faith, pursues one."), *cited with approval in McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 102 (2008) (approving of equitable tolling of FEHA statute of limitations when tolling would support the legislative purposes behind FEHA); *cf.* Cal. Gov't Code § 12960(d)(2) (extending the statute of limitations period for filing a DFEH complaint if the complainant later discovers that his or her employer is actually someone other than the entity listed on the W-2).

Because the Court concludes that the 2012 DFEH complaint named CCC and CoxCom, the Court does not address the parties' additional arguments about whether the continuing violation doctrine saves Plaintiff's 2014 and 2015 DFEH complaints from the one-year statute of limitations.

### 3. Timeliness of 2012 DFEH Complaint

Defendants argue that Plaintiff's FEHA claims are time-barred to the extent that they rely on events occurring before September 14, 2011. Plaintiff argues that his DFEH complaints were timely filed under the continuing violation doctrine.

Generally, the administrative complaint must be filed within one year of the alleged unlawful practice. Cal. Gov't Code § 12960(d). Some statutory exceptions apply. For instance, the one-year period can be extended "[f]or a period of time not to exceed one year following a rebutted presumption of the identity of the person's employer under Section 12928, in order to

allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." *Id.* § 12960(d). Additionally, the continuing violation doctrine allows for a plaintiff to hold a defendant liable for acts of discrimination that fall outside of the one-year statute of limitations if "it is sufficiently connected to unlawful conduct within the limitations period." *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 802 (2001). It requires that: (1) the actions inside and outside the limitations period be sufficiently similar in kind; (2) they occur with sufficient frequency; and (3) they not have acquired a degree of "permanence." *Id.* For example, "when an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or engaging in disability harassment . . . the statute of limitations begins to run . . . either when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, or when the employee is on notice that further efforts to end the unlawful conduct will be in vain." *Id.* at 823-24.

Here, Plaintiff claims to have sought accommodations related to testing his blood sugar levels throughout 2011, including in November 2011 when he asked his supervisor Mariza Garcia if there was a private area where he could test his blood sugar levels. Erica Wilson Dep. 39:11-42:8, CCC-SUF Nos. 63-67, 84, 88. The parties also dispute whether Cox ever required to take intermittent FMLA leave as an accommodation and whether he was even eligible to take FMLA leave before November 2011. Plaintiff allegedly did not actually start taking intermittent FMLA leave until November 2011. DelGiacco Decl. ¶ 24. Thus, a triable issue of material fact exists as to whether Plaintiff's September 14, 2012 DFEH complaint was timely filed under the continuing violations doctrine.

Accordingly, the Court DENIES Defendants' Motion for Summary Judgment as to Plaintiff's FEHA claims on this basis.

### F. FEHA Failure to Provide a Reasonable Accommodation and Failure to Engage in Interactive Process Claims

Plaintiff alleges that his employers violated FEHA by failing to provide reasonable accommodations related to his need to check his blood sugar levels to manage his diabetes and by suspending him.

#### 1. Legal Standard

FEHA makes it unlawful for an employer "to bar or to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment" based on the person's disability. Cal. Gov't Code § 12940(a).

FEHA separately requires employers to make reasonable accommodations for "known physical or mental disabilit[ies] of an . . . employee." *Id.* § 12940(m). Courts have interpreted "reasonable accommodation" within the meaning of FEHA as "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 974 (2008). The statute itself provides examples of reasonable accommodations, such as

> (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities.
> (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

Cal. Gov't Code § 12926(p). When an employee needs time away from the job for treatment or recovery, allowing the employee to take leave or extending leave may be a reasonable accommodation if "the leave is likely to be effective in allowing the employee to return to work at the end of the leave, with or without further reasonable accommodation, and does not create an undue hardship for the employer." Cal. Code Regs. tit. 2, § 11068(c). However, if "an employee can work with a reasonable accommodation other than a leave of absence, an

employer may not require that the employee take a leave of absence." *Id.* When multiple accommodations are potentially available,

> [a]n employer . . . is required to consider any and all reasonable accommodations of which it is aware or which are brought to its attention by the applicant or employee, except ones that create an undue hardship. The employer . . . shall consider the preference of the applicant or employee to be accommodated, but has the right to select and implement an accommodation that is effective for both the employee and the employer . . . .

*Id.* § 11068(e).

FEHA also requires employers "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n).

> Typically, an applicant or employee triggers the employer's obligation to participate in the interactive process by requesting an accommodation. (§ 12940, subd. (n).) Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation. Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.

*Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 62 (2006).

## 2. Analysis

Defendants make two main arguments why Plaintiff's failure to reasonably accommodate and failure to engage in the interactive process claims should fail: (1) Plaintiff did not make clear in 2011 why he needed the accommodations he wanted; and (2) Plaintiff still has not demonstrated today that those accommodations were necessary and reasonable. The Court will address each argument in turn.

Defendants' first argument is that they were never properly notified of what specific limitations necessitated the three accommodations requested by Plaintiff. The Court disagrees. Here, Plaintiff's supervisor Erica Wilson drove him to the hospital in April 2011 when Plaintiff had a diabetic episode. CCC-PAF No. 6. Plaintiff asked Wilson for a specific "medical" code that would allow him to log off the phone system to monitor his blood sugar and manage his diabetes without adversely affecting his job performance record. Erica Wilson Dep. 39:11-41:10. He told Wilson and HR representative Chona Boretti that he needed to be able to stand up and walk around during the workday because of his neuropathy. CCC-SUF No. 63-64, 66. In November 2011, he asked his new supervisor Mariza Garcia about getting access to a private place where he could check his glucose levels. CCC-SUF No. 88. Emails being exchanged between HR personnel and Plaintiff's managers show that they were aware that Plaintiff needed to check his blood sugar levels during the workday and that he was asking for a place other than his desk or car where he could do so. Terri Wilson Dep. Ex. 48 (Dkt. 49-3). Under the "no magic words" standard, these circumstances are enough to make an employer aware that Plaintiff had disability-related work limitations and that the employer should begin engaging in the interactive process of identifying a suitable accommodation. Thus, Plaintiff has raised a genuine dispute of material fact as to whether Defendants were aware of his limitations.

There are also triable issues of material fact regarding who broke off the interactive process first. Defendants claim that Plaintiff never provided medical documentation of specific restrictions requiring additional breaks or a private place to test his blood sugar levels. However, it is not clear that Cox ever asked Plaintiff to provide documentation in response to these specific requests, although HR representative Chona Boretti did ask Plaintiff for medical documentation regarding his standing/walking around request. Plaintiff claims that he did provide documentation to his employer's FMLA administrator even though an earlier instruction by Boretti that he should not name his specific medical condition due to Health Insurance Portability and Accountability Act (HIPAA) privacy concerns made him think that perhaps she did not want medical documentation. DelGiacco Decl. ¶ 24. With regard to the request for a "medical" code, Plaintiff asserts that he was told he had to use intermittent FMLA leave even

though he had already used up all of his FMLA leave for that year to take care of his wife when she was ill with cancer. DelGiacco Decl. ¶¶ 10, 12. Defendants claim that HR representative Boretti never told him that. Boretti Decl. ¶ 7 (Dkt. 49-3). With regard to the request for a private room, Defendants claim that Plaintiff's supervisor Mariza Garcia told him he could use an empty office or a locking men's room. Garcia Decl. ¶ 10. Plaintiff claims that no one ever got back to him. DelGiacco Decl. ¶ 9. Because triable issues of material fact abound, summary judgment cannot be granted on Plaintiff's interactive process claim.

Defendants' second argument is that Plaintiff's claims fail because, even after going through the litigation process, he still has not identified a reasonable accommodation to which he was entitled at the time. If Plaintiff was not entitled to the accommodations he asked for because they were not "reasonable," then Defendants cannot be held liable for failure to provide a reasonable accommodation. Defendants argue that, if Plaintiff cannot identify a reasonable accommodation, then he also cannot prevail on his interactive process claim. The Court agrees.

The California courts are split on whether an employer can still be held liable for failure to engage in the interactive process even if it turns out that no reasonable accommodation was available. In *Wysinger v. Auto. Club of S. California*, 157 Cal. App. 4th 413 (2007), a manager of the Auto Club's Santa Barbara office wanted to be reassigned to Ventura because his daily commute to Santa Barbara aggravated his arthritis. The jury found that the employer did not fail to provide a reasonable accommodation, but the employer did fail to engage in the interactive process. The court upheld the jury verdict, stating that "the jury could find there was no failure to provide a required accommodation because the parties never reached the stage of deciding which accommodation was required. [The employer] prevented this from happening by its refusal to engage in the interactive process." *Id.* at 425. This result suggests that an employer can be held liable for failure to interact even if no reasonable accommodation was required. The court in *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952 (2008), on the other hand, held that an employer can be held liable for failure to engage in the interactive process only if a reasonable accommodation was possible, *id.* at 980-83, and that "the burden of proving the availability of a reasonable accommodation rests on the employee." *Id.* at 984.

*Scotch v. Art Inst. of California-Orange Cnty., Inc.*, 173 Cal. App. 4th 986 (2009), reconciled *Wysinger*, *Nadaf-Rahrov*, and other cases thus: "[D]uring the interactive process itself the employee does not have the same access to information about possible accommodations as the employer does. But . . . through the litigation process, including discovery, the employee must be able to identify a reasonable accommodation that would have been available during the interactive process" in order to prevail on a failure to engage in interactive process claim. *Id.* at 1018. The Court finds this reasoning persuasive because it incentivizes employers to provide information about potential reasonable accommodations during the interactive process (since that information will come out in discovery anyway) and it gives employees leverage to hold employers accountable to their obligation to engage in the interactive process without burdening employees with the responsibility to articulate reasonable accommodations before they gain access to information in the employer's possession. *See id.* ("An employee cannot necessarily be expected to identify and request all possible accommodations during the interactive process itself because [e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have . . .") (internal quotation marks omitted) (alteration in original). Thus, this Court holds that Plaintiff cannot prevail on his failure to engage in interactive process claim unless he can show that a reasonable accommodation was available at the time.

Here, Defendants argue that unlimited breaks were not a reasonable accommodation because an essential function of Plaintiff's job was to be at his desk answering the phone. To the extent that Plaintiff's request for a "medical" code was a request to be paid for doing no work, that would be unreasonable. However, reading the evidence in the light most favorable to him, Plaintiff likely simply wanted permission to take more breaks than he normally received, within some reasonable limit. Defendants further argue that Plaintiff did not need additional breaks to check his blood sugar levels because he already had sufficient regular break times and flexibility to take additional breaks during his shifts. What constitutes a reasonable accommodation is a question of fact. *Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738, 743 (9th Cir. 1999). Since there are

genuine disputes of fact as to what Plaintiff's limitations actually were and what Defendants knew about Plaintiff's limitations, the Court cannot find that Plaintiff's requested accommodations were per se unreasonable. Thus, the Court will leave the question of reasonableness to the jury.

Accordingly, the Court DENIES Defendants' Motion for Summary Judgment as to Plaintiff's failure to accommodate and failure to engage in an interactive process FEHA claims.

### G. FEHA Punitive Damages

Defendants argue that Plaintiff is not entitled to punitive damages on his FEHA claim because (1) Defendants did not act with malice by making routine, ordinary business decisions and (2) none of the individuals making decisions regarding Plaintiff's requests for accommodations were "managing agents" of CoxCom or CCC.

### 1. Legal Standard

In order to obtain punitive damages for his FEHA claims against his corporate employer, Plaintiff must show by clear and convincing evidence that an officer, director, or managing agent of the corporation "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a)-(b). "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1).

The California Supreme Court has interpreted the term "managing agent" "to include only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566-67 (1999). "Corporate policy" refers to "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715 (2009). The ability to hire and fire other employees is not sufficient by itself to make someone a

managing agent. *White*, 21 Cal. 4th at 577. "The scope of a corporate employee's discretion and authority under [the *White*] test is . . . a question of fact for decision on a case-by-case basis." *Id.* at 567.

"For purposes of determining an employer's liability for punitive damages, ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties." *Coll. Hosp. Inc. v. Superior Court*, 8 Cal. 4th 704, 726 (1994). "Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." *Id.*

## 2. Analysis

### a. Scope of Plaintiff's FEHA Claims

Some of the higher-level Cox employees who could potentially be managing agents only knew about some but not all of the actions that lower-level employees took with respect to Plaintiff's requests for accommodations and suspension. Thus, as a preliminary matter, the Court must ascertain what is within the scope of Plaintiff's FEHA claims. Based on the parties' briefing and oral arguments, there appear to be four potential actions or omissions at issue: (1) not providing a "medical" code that Plaintiff could use to take additional breaks without negative consequences; (2) not allowing him flexibility to stand and walk around instead of sit at his desk; (3) not providing a private, sanitary place where he could check his blood sugar levels; and (4) stopping him from taking the accommodation of intermittent FMLA leave by suspending him.

Defendants argue that Plaintiff did not plead any of these failures except the first one in his complaint. This is not quite accurate. The complaint states:

> Mr. DelGiacco repeatedly asked about obtaining a reasonable accommodation for checking his blood sugar levels at work to avoid any episodic reactions. He also inquired about a code that he could use to log off the phone system so that he could check his sugar levels throughout his shift. Cox had accommodated similar requests from employees in Mr. DelGiacco's same position who were pregnant or who were breast feeding. However, Cox consistently and repeatedly denied Mr.

> DelGiacco any type of reasonable accommodation so that he could check his blood sugar (a procedure that only takes a few minutes to conduct).

Compl. ¶ 13. Although the complaint does not provide specific accommodations Plaintiff asked for besides the "medical" code, the complaint is clear that he did ask for other types of accommodations. Plaintiff testified in his deposition and emails were produced during discovery showing that he asked for permission to walk around to improve blood circulation in his legs. *See supra* Part I.A.2.b. His testimony and emails also revealed that he asked for a private space in which to test his blood sugar levels. Defendants themselves recognized that these issues were raised during discovery, as they brought up these issues in their statement of uncontroverted facts accompanying CCC's and CoxCom's motion for summary judgment. *See* CCC-SUF Nos. 63-92.

The Ninth Circuit held in *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963 (9th Cir. 2006), that a district court need not address allegations raised for the first time after the close of discovery and in response to a motion for summary judgment if the plaintiff's pleadings did not provide sufficient notice of those allegations. *Id.* at 965. Here, however, Plaintiff's complaint did provide notice that Plaintiff's FEHA claim was factually based on more than the "medical" code request and those issues were explored in discovery, as demonstrated by Defendants (not Plaintiff) being the first to raise them at the summary judgment stage. Since Defendants do not and could not claim that they were prejudiced by lack of time to develop their defenses, the Court is not persuaded that Plaintiff's failure to plead his standing/walking and private room requests with greater particularity at the start of the case should, alone, preclude him from raising those issues at trial. This is particularly so in light of the fact that Rule 15(b) allows amendment of pleadings to conform to the evidence even during and after trial, so long as the other party is not prejudiced.

The analysis of Plaintiff's suspension is a little different. Plaintiff argues that his suspension was a failure to provide a reasonable accommodation under § 12940(m) because his suspension cut off his ability to take intermittent FMLA leave. However, Plaintiff has provided no legal authority for this theory. The Court has considered that the suspension could be

interpreted as Defendants forcing Plaintiff to take a full-time leave of absence even though he could work with another reasonable accommodation, such as intermittent leave. FEHA regulations provide that, if "an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require that the employee take a leave of absence." Cal. Code Regs. tit. 2, § 11068(c). Section 11068(c), however, addresses what an employer should do when deciding between a leave of absence and other forms of accommodation; it is not a prohibition against employers suspending employees. There is no evidence here that Defendants thought of the suspension as a potential way to accommodate Plaintiff's diabetes. Thus, Plaintiff's suspension theory fails under § 12940(m).

It seems to this Court that the suspension could more viably support a cause of action under California Government Code § 12940(a), which prohibits discrimination in the terms and conditions of employment, as opposed to causes of action under §§ 12940(m) or (n), which require employers to provide reasonable accommodations and to engage in an interactive process to identify reasonable accommodations. However, Plaintiff has not explicitly pled a cause of action under § 12940(a), nor has Plaintiff requested that the Court grant leave to amend the complaint to plead such a cause of action or that the Court consider at the summary judgment stage whether Plaintiff may be entitled to relief under § 12940(a).[4] Thus, the Court will not *sua sponte* construe Plaintiff's suspension-as-a-failure-to-accommodate theory as a request to consider his entitlement to relief under § 12940(a).

Accordingly, the Court considers Plaintiff's FEHA claims limited at this stage to the first three omissions, not including Plaintiff's suspension.

---

[4] Rule 8 requires the plaintiff to plead facts supporting *claims for relief*, not causes of action, statutes or legal theories. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008). "Even when the plaintiff is represented by counsel, and counsel initially misconceived the proper legal theory of the claim," plaintiff can prevail on summary judgment if the plaintiff is entitled to relief on some other legal theory and requests such relief in opposing summary judgment. *Id.* at 1158 (internal quotation marks omitted); *see also Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir. 1995) (holding that district court erred in granting summary judgment to defendant after holding that plaintiffs' state law claims were preempted by ERISA even though plaintiffs' had asked in their opposition to defendants' summary judgment motion that the court consider whether plaintiffs were entitled to relief under ERISA in the event that their state law claims were preempted). Here, unlike the plaintiffs in *Alvarez* and *Crull*, Plaintiff has not articulated or argued a § 12940(a) theory even at the summary judgment stage. Rather, Plaintiff has insisted that his suspension is failure to accommodate under § 12940(m), which the Court has held is not a viable legal theory.

### b. Relevant Facts

The Court now considers whether summary judgment on FEHA punitive damages is appropriate. The following persons occupied the following roles within Cox and played the following roles in decisions regarding Plaintiff's requested accommodations and suspension:

Plaintiff's immediate supervisors were first Erica Wilson and then Mariza Garcia. They supervised a team of 13 retention representatives. Their authority to impose discipline and make personnel decisions was limited to the roughly 13 members of their employee teams. CCC-SUF Nos. 97. Wilson knew about Plaintiff's diabetes and spoke to him about his need for accommodations. She allegedly failed to provide him the "medical" code that he asked for. Garcia also knew about Plaintiff's diabetes because Plaintiff asked her for a private space where he could check his glucose levels. Garcia allegedly failed to respond to Plaintiff's request. Garcia and her supervisor Jessica Allsopp were the ones who first listened to the tapes where Plaintiff allegedly mishandled calls. Garcia, Allsopp, and HR representative Chona Boretti attended the December 7, 2011 meeting where they informed Plaintiff he was being suspended.

HR representative Chona Boretti communicated with Plaintiff about his need for accommodations for his diabetes, in particular his standing/walking request. She participated in email chains about his request for a private room. She was aware that his previous experience with Cox's FMLA administrator had almost led to legal problems. Boretti did not supervise anyone as part of her work at Cox, nor did she develop human resources policies for Cox. CCC-SUF Nos. 99-100.

Jessica Allsopp was Erica Wilson's and then Garcia's supervisor. In 2011, Allsopp supervised between 50-150 employees. CCC-PAF No. 201. There is some evidence that she was involved in granting Plaintiff intermittent FMLA leave. Terri Wilson Dep. 101:3-102:20. She participated in email chains discussing his request for a private space to test his blood sugar. *Id.* Ex. 47, 48. She and Garcia were the ones who initially discovered the tapes of Plaintiff allegedly mishandling calls. She participated in the decision to suspend and terminate Plaintiff.

Allsopp's boss in 2011 was Pablo Pareja, director of sales and retention. Terri Wilson Decl. ¶ 3. He was notified about the mishandled calls when Allsopp discovered them. He

participated in the decision in December 2011 to suspend and terminate Plaintiff. Terri Wilson Dep. 273:3-274:6; Terri Wilson Decl. ¶ 6.

In 2011, Terri Wilson was Boretti's supervisor. CCC-SUF No. 23; CCC-PAF No. 203. In 2011, she was the Director of People Services for Cox for all of California and she reported to Sharon Smith, Vice President of People Services for California. Terri Wilson Decl. ¶¶ 1, 4-5. In 2011, Wilson had the authority to hire and fire within the HR department and she had to approve suspension and termination decisions for employees in other departments, altogether totaling 2,800 employees in California. Terri Wilson Dep. 503:13-19. Wilson was involved in discussions with Boretti and Joe Freeman regarding Plaintiff taking intermittent FMLA leave. *Id.* at 101:3-102:6, 270:1-22. She participated in the decision to suspend and terminate Plaintiff. Terri Wilson Decl. ¶ 6.

Joe Freeman is the Executive Director, Assistant General Counsel for CCI, four levels below the CEO of CCI. He provides employment related advice regarding all 18,000 employees of CCI and its subsidiaries. In 2011, he provided such advice regarding 20,000 employees. CCC-PAF Nos. 204-206. He discussed Plaintiff's taking intermittent FMLA leave with Boretti and Terri Wilson. Terri Wilson Dep. 101:3-102:6, 270:1-22. He was consulted for his legal opinion when Allsopp, Pareja, Boretti, and Terri Wilson made the decision to terminate Plaintiff. *Id.* at 368:19-370:2.

### c. Evidence Supporting Punitive Damages

It is beyond dispute that Boretti, Wilson, and Garcia were not managing agents for § 3294(b) purposes, as they did not occupy positions from which they could determine corporate policy. Thus, their conduct, even if malicious, cannot support an award of punitive damages unless someone who was a managing agent within the company authorized or ratified their actions. Alternatively, a managing agent could have acted with malice themselves.

Freeman cannot serve as managing agent because he was employed by CCI, not CCC or CoxCom. In any event, there is no evidence in the record that he was a decision-maker with regard to Plaintiff's accommodation requests, as opposed to someone merely consulted for legal advice. Thus, his conduct cannot support an award of punitive damages.

Pareja was a higher-level employee who may have determined CoxCom's or CCC's corporate policy. However, even if Pareja is a managing agent, Plaintiff has not provided evidence that Pareja even knew about Plaintiff's diabetes or about his requests for accommodations at all, let alone that Pareja authorized or ratified any of the actions his subordinates took with regard to Plaintiff's requests. Thus, Pareja's conduct cannot support an award of punitive damages either.

Terri Wilson could be a managing agent because she was second-in-command of the HR department for California, had the authority to hire and fire within her own department, and had to sign off on all termination decisions of employees below the director level are sufficient to find her a managing agent. Unlike Pareja, there is some evidence that she was aware of Plaintiff's history of seeking accommodations. (Boretti asked her to ask Freeman for advice about whether Plaintiff was eligible to take intermittent FMLA leave. Terri Wilson Dep. 101:3-102:20.) However, Plaintiff has not directed the Court to evidence showing whether Wilson approved of requiring Plaintiff to take intermittent FMLA leave even though he potentially was not eligible for it and whether she believed that that constituted a reasonable accommodation under FEHA. Thus, her conduct cannot support an award of punitive damages.

With regard to Allsopp, even if she could be a managing agent, Plaintiff has not directed the Court to evidence that Allsopp knew about Plaintiff's request for a "medical" code or his request for permission to stand up and walk around during his shift. Allsopp was aware of his request for a private room to test his glucose, but there is no evidence that she authorized or ratified Garcia's or Boretti's alleged failure to respond to Plaintiff's request. Thus, her conduct cannot support an award of punitive damages either.

Accordingly, the Court holds that Plaintiff cannot recover punitive damages on his failure to reasonably accommodate and failure to engage in the interactive process claims.

### H. Spoliation of Evidence

Plaintiff argues that Defendants should be sanctioned for destroying the tapes of the calls that Plaintiff supposedly mishandled and for which he was suspended. Plaintiff seeks sanctions ranging from terminating sanctions to various evidentiary sanctions.

### 1.  Legal Standard

"Spoliation of evidence is 'the destruction or significant alteration of evidence, or the failure to properly preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  *Lifetouch Nat'l Sch. Studios, Inc. v. Moss-Williams*, Case No. C10-05297 RMW (HRL), 2013 U.S. Dist. LEXIS 148360, at \*7 (N.D. Cal. Oct. 15, 2013) (quoting *Zubulake v. UBS Warburg LLD*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

Most courts use the three-part test set forth in *Zubulake*:

> A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]

*Montoya v. Orange County Sheriff's Dep't*, Case No. 11-cv-1922, 2013 U.S. Dist. LEXIS 180682, at \*19-20 (C.D. Cal. Oct. 15, 2013) (internal quotation marks omitted). "Litigants have an obligation to preserve evidence from the moment that litigation is reasonably anticipated." *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1136 (N.D. Cal. 2012) ("*Apple I*"). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011).

If a party is found to have spoliated evidence, the court then determines whether and which sanctions are appropriate. Courts choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Apple Inc. v. Samsung Electronics Co.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) ("*Apple II*"). "Ultimately, the choice of appropriate spoliation sanctions must be determined on a case-by-case basis, and

should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence." *Id.* at 992-93.

## 2. Analysis

Here, the relevance prong is easily satisfied. The tapes are key to understanding the motivation behind the decision to suspend and to eventually terminate Plaintiff. Without ever having heard the tapes, it is much more difficult for Plaintiff to refute Defendants' descriptions of the tapes.

However, because it is not clear when or in what circumstances the tapes were lost, it is not clear whether Defendants had a duty to preserve or what Defendants' state of mind was at the time the tapes were lost. The tapes could have been destroyed as early as December 7, 2011, the day that Plaintiff was suspended, or they could have been deleted 30 days or more later, pursuant to Cox's normal retention policies.

Defendants clearly had a duty to preserve evidence after December 3, 2012, when Defendants received Plaintiff's demand letter. Before that point, however, Defendants would only have had a duty if there was a reasonable expectation of litigation. There is evidence that Defendants recognized at the time they suspended him that Plaintiff's experiences with Cox's FMLA administrator UNUM while he was on FMLA leave caring for his wife had once almost led to legal troubles. But, the Court cannot say that a reasonable person in Defendants' situation would have expected Plaintiff to sue Defendants regarding his suspension. As Defendants point out, after his troubles with UNUM, Plaintiff came back to work without bringing a lawsuit. Of course, being suspended for cause is different from feeling harassed by an employer's FMLA administrator and it is not uncommon for an employee upset by a sudden adverse employment action to sue their employers. However, ultimately, "[a] general concern over litigation does not trigger a duty to preserve evidence. [A party has] no duty to preserve relevant documents or evidence until a potential claim was identified or future litigation was probable." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526 (N.D. Cal. 2009).

Plaintiff argues that Defendants had a separate legal duty to preserve the tapes under 29 C.F.R. § 1602.14, which states:

> Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later.

Defendant argues that this regulation does not apply to the tapes because the tapes are not "personnel or employment record[s]" within the meaning of the regulation. There is not much case law on point. However, the Seventh Circuit has held that "[e]mployers are not required to keep every single piece of scrap paper that various employees may create during the termination process. It is sufficient that the employer retains only the actual employment record itself, not the rough drafts or processes which may lead up to it." *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 558-59 (7th Cir. 2001). That case involved an employer who asked its managers to fill out ranking sheets and write evaluation notes to rank at-risk employees who would be terminated. The Seventh Circuit affirmed a district court's finding that § 1602.14 only required the employer to preserve the summary sheet containing the final rankings, not each manager's rankings and evaluation notes. *Id.* Here, similar to the ranking sheets in *Rummery*, the tapes were the raw material on which the employer's personnel decision was based, but they were not the actual employment records that the employer was required to keep.

Even if the tapes were squarely employment or personnel records under § 1602.14, the Court still would not be inclined to find spoliation as Plaintiff has not demonstrated that Defendants acted with a culpable state of mind. Defendants preserved and produced a number of documents related to the calls at issue. Allsopp explained that, although she sometimes downloaded calls off of the Qfiniti system onto her local computer, it was not her normal practice to save all of the tapes that she reviewed for disciplinary issues. Allsopp Decl. ¶¶ 6-7 (Dkt. 58-1, Ex. 7). Plaintiff insinuates that Defendants must be hiding something because they did not produce Allsopp as their Rule 30(b)(6) witness and because their 30(b)(6) witness did not have clear answers about the tapes. However, Plaintiff does not explain why he did not

simply subpoena Allsopp as a percipient witness. Without stronger evidence that Allsopp or other employees willfully caused the tapes to be deleted or that it was grossly negligent for them to do so because they should have foreseen a lawsuit involving the tapes, the Court is not inclined to find spoliation or to grant an adverse inference instruction or other sanctions at this time.

**IV. Disposition**

For the reasons discussed above, the Court ORDERS as follows:

(1) Cox Enterprises, Inc.'s Motion for Summary Judgment is DENIED AS MOOT;

(2) CCI's Motion for Summary Judgment is GRANTED and Plaintiff's claims against CCI are DISMISSED WITH PREJUDICE;

(3) CCC and CoxCom's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

    a. Plaintiff is not entitled to punitive or emotional distress damages on his FMLA claims;

    b. Plaintiff is not entitled to punitive damages on his failure to reasonably accommodate and failure to engage in the interactive process FEHA claims;

    c. Triable issues of material fact remain as to:

        i. Whether Plaintiff's taking intermittent FMLA leave in November 2011 was a negative factor in Defendants' decision to suspend him;

        ii. Whether Plaintiff timely filed his September 14, 2012 DFEH complaint;

        iii. Whether Defendants failed to provide reasonable accommodations; and

        iv. Whether Defendants failed to engage in an interactive process with Plaintiff; and

(4) Plaintiff's Motion for Sanctions is DENIED.

The Court also hereby ORDERS as follows:

(5) Plaintiff shall file oppositions to Defendants' motions in limine on or before **Tuesday, April 7, 2015**. Defendants shall also file oppositions to Plaintiff's motions in limine by that date;

(6) The parties shall lodge an amended proposed final pretrial order consistent with this order on or before **Thursday, April 9, 2015**; and

(7) The parties are ordered to attend a mandatory settlement conference with Magistrate Judge Douglas F. McCormick on **Monday, April 13, 2015, at 11:00 a.m**.

DATED:      April 6, 2015

_David O. Carter_

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE